**SO ORDERED.**

**SIGNED this 19 day of September, 2017.**

*Stephani W. Humrickhouse*

**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### GREENVILLE DIVISION

**IN RE:**

**OUTER BANKS VENTURES, INC.**                    **CASE NO. 15-06168-5-SWH**

      **DEBTOR**                                                     **CHAPTER 11**

### ORDER ALLOWING AMENDED OBJECTION TO CLAIM
### AS TO CALCULATION AND REQUIRING FILING OF
### AMENDED PROOF OF CLAIM

The matters before the court in this chapter 11 case are the remaining aspects of the debtor's amended objection to the claim of J. Jeffrey Tinkham Family Trust ("the Trust"). An order denying the objection to the extent that it asserted the North Carolina Rules of Professional Conduct as a defense to the proof of claim was entered on December 19, 2016 (D.E. 276), and subsequent hearings were held to address the remaining components of the debtor's objection. For the reasons that follow, the objection will be allowed on grounds that the Trust's claim is improperly calculated.

### PROCEDURAL BACKGROUND

Debtor Outer Banks Ventures, Inc. ("OBX" or "debtor") filed a petition under chapter 11 of the Bankruptcy Code on November 12, 2015. The Trust filed a proof of claim on December

29, 2015, asserting a secured claim in the amount of $902,716.69, which includes interest to the date of the petition.  On February 9, 2016, the debtor, along with Richard C. Willis and Richard A. Brindley (collectively, "plaintiffs"), initiated an adversary proceeding ("the AP") against J. Jeffrey Tinkham ("Tinkham") and the J. Jeffrey Tinkham Family Trust ("the Trust") (collectively, "Tinkham Parties"), asserting claims for constructive fraud, duress, violation of N.C. Gen. Stat. § 84-13, fraudulent practice by an attorney, disallowance of the Tinkham Parties' claims and liens against property of the estate, and punitive damages.  Adv. Pro. No. 16-00009-5-SWH.  The plaintiffs' fifth claim for relief specifically requested that the proof of claim be denied in its entirety. On  March 16, 2016, the debtor filed its first objection to the claim of the Trust,[1] which simply incorporated "all of the issues, defenses and claims raised by the Debtor in the Tinkham Adversary Proceeding," and requested denial of the claim in full.  (D.E. 83 at 1) Plaintiffs filed an amended complaint in the AP on March 21, 2016, after which the Tinkham Parties moved to dismiss all claims.  The court granted the motion to dismiss by order dated August 12, 2016 ("Order Dismissing"), which dismissed all causes of action in the AP in their entirety.  (D.E. 28)  The debtor, Brindley and Willis filed a notice of appeal of the Order Dismissing on August 24, 2016, and that appeal remains pending.

On October 10, 2016, the debtor filed an amended objection ("Amended Objection") to the claim of the Trust, again incorporating all issues, defenses and claims raised in the AP but also objecting on grounds of improper calculation.  In addition, the debtor asserted that the claim was barred "under applicable nonbankruptcy law . . . on grounds different than those asserted in the Tinkham Adversary Proceeding."  Amended Objection at 1-2 (D.E. 223).  A hearing was

---

[1]Only the Trust filed a proof of claim.

held on November 15, 2016, which established the "applicable nonbankruptcy law" objection to be Tinkham's alleged violation of the North Carolina Rules of Professional Conduct ("Professional Rules") while serving as attorney for the debtor.  In light of the Order Dismissing, the court determined that a threshold issue in ruling on the Amended Objection was whether the debtor was barred, under principles of res judicata or waiver, from raising the Professional Rules argument.  In the order entered on December 19, 2016, the court found that the argument was barred by res judicata. (D.E. 276)

Thus, the issues before the court pertain to the debtor's remaining ground for objection, which is that Claim #6 is incorrectly calculated in multiple respects; namely that it fails to account for an absolute assignment, contains an improper calculation of interest which is, in reality, an added penalty or fee, and reflects other calculation errors.  Sequential hearings were conducted over the span of five days, including a final hearing in which counsel presented their closing arguments.  Having thoroughly considered the testimony, the parties' pleadings, and the admitted exhibits, the court concludes that 1) the debtor solidly rebutted the presumed validity of the claim thus allowing the claims objection to proceed as to the amount, calculation and propriety of its components; and 2) the Trust failed to meet its burden of establishing, by a preponderance of the evidence, the validity and amount of its claim.

## FACTUAL BACKGROUND

Prior to 2009, Richard A. Brindley ("Brindley") and Richard C. Willis ("Willis") were engaged in efforts to develop property and wastewater treatment operations in Salvo, North Carolina, as well as Dare and Currituck Counties in North Carolina.  Tinkham, who is an attorney and also was Willis's brother-in-law, became involved in these efforts.  On January 20,

2009, Brindley, Willis and Tinkham executed an agreement ("2009 Agreement") whereby Tinkham agreed to provide up to $500,000.00 as a capital contribution in exchange for a one-third interest in the development project.[2]  Trust Ex. Q-2.[3]  Pursuant to the 2009 Agreement, if certain contingencies did not occur in 2009, Tinkham would have the option to convey his ownership interest in the project to Brindley and Willis and convert his capital contribution into a loan, to be paid within one year of such conversion at six percent interest per annum.  *Id.*  The contingencies were not met within the 2009 time frame, but the parties nonetheless continued working toward the original development goals, and Tinkham continued to be a legal advisor. There is no evidence of any formal conversion of the 2009 Agreement.

In June 2011, Brindley, Willis, the debtor and Tinkham executed a Credit Line Deed of Trust Note ("2011 Note"), which consolidated Tinkham's previous investment of $483,028.00 under the 2009 Agreement with two other separate advances,[4] and established a $1,000,000.00

---

[2]Brindley and Willis signed the Agreement on January 20, 2009, but Tinkham signed it on January 23, 2009.

[3]This document is designated "Trust Ex. Q-3" because the document was attached by the Trust to its proof of claim, which was designated Exhibit Q.  The 2009 Agreement was introduced into evidence as a component of Exhibit Q but was not separately introduced by the Trust, so it does not have a unique exhibit designation.  Accordingly, within this order, that document and others introduced into evidence as part of the Trust's Exhibit Q (the proof of claim) will be denominated as "Trust Ex. Q-__" and numbered according to the proof of claim's list of attachments.
For documents introduced by the Trust as an individual exhibit *and* as an attachment to the proof of claim (such as the Tinkham Loan Schedule, which is (at least as to the first two pages) both Trust Exhibit A and a component of Trust Exhibit Q), the court will use the unique exhibit identifier; *e.g.*, the Tinkham Loan Schedule is Trust Ex. A.

[4]The 2011 Note consolidated two prior advances of $50,000.00, made on December 24, 2010, and April 20, 2011, respectively

4

line of credit.  Trust Ex. Q-3.  The 2011 Note incorporated the $483,028.00 "advanced"[5] under the 2009 Agreement as follows:

> In accordance with the Agreement, no interest accrued on this sum during 2009. Commencing on January 1, 2010, interest at the rate of six percent (6%) per annum compounding monthly began to accrue on the principal sum of $483,028.00 and, as stated in the Agreement, all principal and accrued interest thereon was to be repaid prior to December 31, 2010.  Said principal sum and interest has not been paid and remains outstanding.

*Id*. at 1.  The 2011 Note provided for a maturity date of December 31, 2011 on the consolidated advances and the line of credit.  *Id.*  As security for the 2011 Note, the debtor executed a Future Advances Deed of Trust encumbering certain real property, which also is dated June 1, 2011. Trust Ex. Q-4 ("Future Advances DOT").

In 2012, Tinkham agreed to release portions of the collateral securing the 2011 Note to facilitate a sale of some of the debtor's property.  Also in 2012, the parties executed a Borrowers Certificate[6], dated September 12, 2012, which states that the amount outstanding on the 2011 Note is $832,352.13.  Trust Ex. Q-5.  In 2013, Willis, Brindley and OBX were again faced with a potential sale of other property owned by the debtor, and they sought another release of collateral from Tinkham to facilitate the sale.[7]  The parties eventually arrived at a restructure of the

---

[5]The 2011 Note refers to Tinkham's $483,028.00 capital contribution as an advancement.

[6]The Borrowers Certificate spans the period from January 23, 2009 through June 26, 2012.  It does not include the $39,748.88 "late fee" that Tinkham imposed in October 2013 but made retroactively effective as of January 1, 2012.  The Trust's Exhibit B calculations show that Tinkham inserted the fee as a line item entry on that date, along with a change in the interest rate from 7.5% to 18%.  Trust Ex. B.

[7]The debtor, Willis and Brindley alleged in the AP that Tinkham advised them to go forward with the 2013 sale, but later changed his mind and refused to cooperate, causing suit to be threatened against the debtor by the prospective purchaser.  This issue and others related to it were resolved in the Order Dismissing.  (D.E. 28)

indebtedness owed to Tinkham, which included an extension of the maturity date and an accommodation of the sale.

In an email from Tinkham to Willis on October 21, 2013, subject line "FW: Amortization Schedule," Tinkham wrote:

> Rick ... Here are the accountant's promissory note calculations. The first section called "Cash Flow Data" consists of all the data inputs that were loaded into the program. I have double checked them and they are accurate. Event 45 on 1/1/12 is the 5% late fee ($39K) in the promissory note. The loan payoff on 10/31/13 is $1,311,899.95.

Trust Ex. I. The email exhibit also includes Willis's response: "I am having these calculations reviewed. If any notices have been made on the note, please provide them. I have been asked for copies of any documents proving the amount owed. Could you please provide these at your convenience? This would include any notes agreements or other records demonstrating what is owed." *Id.* The accountant's promissory note calculations are in Trust Exhibit B, also dated October 21, 2013, which lists the "Event 45" to which Tinkham referred as a "loan" entry of $39,748.00, made on January 1, 2012. On that same date (January 1, 2012), as Event 46, Trust Exhibit B reflects an interest rate change from 7.5% to 18% compounding monthly.

On December 20, 2013, the parties executed the First Amendment to Credit Line Deed of Trust Note and Deed of Trust ("2013 Amendment"). Trust Ex. Q-10. The 2013 Amendment restated the obligations of the debtor and others under the 2011 Note. It included a recitation that one or more events of default had occurred and were continuing under the 2011 Note, the Future Advances DOT, and two deeds of release and substitutions of collateral. It states that the original makers to those documents "requested that Tinkham forbear from exercising his rights and remedies under the Loan Documents due to said defaults, and to modify certain terms of the

6

Loan Documents." *Id.* In consideration "for the foregoing premises," the 2013 Amendment restructured the 2011 Note to extend the maturity date from December 31, 2011 to December 31, 2015, released and substituted the collateral, and substituted the Trust as holder of the 2011 Note. *Id.* Paragraph 7 of the 2013 Amendment provides:

> The *parties acknowledge that the interest rate that accrues and compounds monthly on all outstanding sums owed under the Loan Documents is eighteen percent (18%) per annum. Said eighteen percent compounding rate shall continue to accrue*[8] *on all sums owed under the Loan Documents until paid in full*, provided, however, that from January 1, 2014 until the Note's new maturity date of December 31, 2015, the interest rate accruing during that twenty four month period on all outstanding sums under the Loan Documents shall be reduced to fifteen percent (15%) per annum, compounding monthly if, and only if, all of the following three (3) conditions occur:
>
>> a. Florida OBX, LLC performs all of its payment and other obligations [as required under the 2013 Assignment and 2013 Promissory Note, provided that if it does not, the Trust must give notice and an opportunity to cure to the debtor]; and
>>
>> b. During 2014, the Maker and Florida OBX, LLC, individually or jointly, shall pay an aggregate sum of at least Five Hundred Thousand Dollars ($500,000.00) to the Trust, which sum shall be applied to the Maker's obligations under the Loan Documents. This requirement may be satisfied by payments under the Phase 12 Note; and
>>
>> c. All sums owed to the Trust under the Loan Documents shall be paid in full on or prior to the Note's new maturity date of December 31, 2015.
>
> If the aforesaid three conditions are not timely satisfied, the interest rate of eighteen percent, compounding monthly, shall not be reduced, but rather it shall continue to accrue on all outstanding sums payable under the Loan Documents from the Note's original maturity date of January 1, 2012 until said sums are paid in full.

Trust Ex. Q-10 (emphasis added).

---

[8]As will be discussed later, the 2011 Note did not provide for interest at the default rate of 18% to be compounded monthly, or for it to accrue on "all outstanding sums." Trust Ex. Q-3 at 2.

Not included among the Trust's exhibits in support of its proof of claim are documents reflecting additional transactions that also occurred on December 20, 2013, involving an assignment of claim.  Contemporaneously with the 2013 Amendment, Florida OBX, LLC executed a Promissory Note wherein it promised to pay to the debtor, OBX, the sum of $900,000 together with fixed interest on the unpaid principal balance of the note at a rate of 6% per annum.  Debtor Ex. 1 ("2013 Promissory Note").  The 2013 Promissory Note includes the following language:

> Borrower acknowledges that Lender has assigned this Note to J. Jeffrey Tinkham, Trustee of the J. Jeffrey Tinkham Family Trust ("Trust") pursuant to an Assignment of Note and Deed of Trust with Recourse instrument dated on or about the date of this Note.  As such Borrower shall pay to the Trust at 1042 Algonquin Road, Norfolk, VA 23505, all principal, interest and other sums payable under this Note, the Loan Agreement and Deed of Trust securing this Note and treat the Trust as the lender and noteholder hereunder, until otherwise notified in writing by the Trust.

Debtor Ex. 1 at 2-3.  The 2013 Promissory Note was assigned by the debtor to the Trust on the same day.  Debtor Ex. 2 ("2013 Assignment").  The 2013 Assignment, captioned "Assignment of Note and Deed of Trust With Recourse," identifies debtor OBX as the assignor and owner of the 2013 Promissory Note, and identifies J. Jeffrey Tinkham, Trustee of the J. Jeffrey Tinkham Family Trust, as assignee.  The 2013 Assignment provides:

> For value received, the Assignor does hereby grant, sell, assign, transfer and convey unto the Assignee, its successors and assigns, all of the Assignor's right, title and interest, both legal and equitable, in, to, and under, (i) the Note, together with all amounts due and to become due thereon, including interest; (ii) the Deed of Trust, together with the real property described therein and all rights accrued or to accrue thereunder, including interest, and (iii) all other security for repayment of the Note, if any, including, but not limited to, the following: the Loan Agreement between Florida OBX, LLC, Borrower, and Outer Banks Ventures, Inc., Lender, dated December 20, 2013.

> This Assignment is made with recourse.

8

>Assignor further authorizes and empowers Assignee, its successors and assigns, to
>exercise all rights, powers and privileges conferred upon Assignor by the Note,
>the Deed of Trust, and any other instrument which secures repayment of the Note,
>including, but not limited to, the right to invoke the foreclosure and sale authority
>given in the Deed of Trust to the beneficiary, in as full and ample a manner as
>Assignor is authorized and empowered to exercise same.

Debtor's Ex. 2 at 1-2.  The Trust's accounting of the OBX debt does not reflect the $900,000

assignment at the time it was made.  Trust Ex. A.  It does reflect payment of $50,000 by OBX to

the Trust on December 23, 2013, pursuant to Paragraph 6 of the 2013 Amendment.  It also

reflects payments of $423,000 on December 30, 2014, and $362,963 on January 22, 2015, made

by Florida OBX to the Trust, both of which were made pursuant to the 2013 Assignment.

On December 5, 2014, Tinkham, as trustee for the Trust, notified OBX that it and the

other signatories to the 2013 Amendment and other agreements were in default under those

agreements (collectively, the "Loan Documents").  Trust Ex. D ("Default Notice").  Tinkham's

letter identified four independent events of default under the Loan Documents.  The first event

states that "[o]ne or more Makers are insolvent or have otherwise breached the Loan Documents

due to their failure to pay" certain listed judgments, liens or loan amounts due to third parties,

which, under the Loan Agreements, may constitute a default under the Loan Agreements as well.

The Default Notice further states that 2) OBX failed to pay $4,300.13 in real estate taxes due to

Currituck County; 3) OBX committed waste by removing sand from a Phase 2 Property and

violated a county ordinance by improper placement of construction debris; and 4) OBX failed to

timely perform its obligations under a loan to OBX from Wells Fargo Bank.  During the hearing,

Tinkham testified that other than the allegation of waste, none of the events of default pertained

to amounts owing to the Trust, or defaults under obligations to the Trust.  Instead, they reflected

Tinkham's determination that OBX and/or other "Makers" had defaulted in obligations owed by

one or any of them to third parties in ways that could qualify as events of default under the Loan Documents.[9]  Tinkham declared in the default notice that all amounts payable under the Loan Documents were "hereby accelerated and are now due and payable," and requested that when the recipients of the Default Notice were "in a position to pay all sums owed under the Loan Documents," that they contact him for a final payoff figure.  Trust Ex. D.

On January 16, 2015, an agreement was made between OBX, the Trust, and Florida OBX regarding the 2013 Assignment of the $900,000 note. Trust Ex. L (the "2015 Agreement").  This document, captioned simply "Agreement," recites that Florida OBX had paid to the Trust $501,000 of the $900,000 owed, leaving a balance of $399,000; that Florida OBX desired to pay $37,500 as a professional fee to Robert Burgin and Carlos Gomez, which amount would be applied to the $900,000 note; that a remaining principal balance of $361,500 plus interest at 6% per annum remained on the note, which amount Florida OBX would wire to the Trust (the "Final Payment"); and that the Trust would apply the Final Payment to OBX's payment obligations under the 2011 Note.

On November 13, 2015, OBX filed a petition under chapter 11 of the Bankruptcy Code. The Trust filed its proof of claim in the amount of $902,716.79 on December 29, 2015, to which the debtor has objected.

_____

[9]During the hearings, Willis testified credibly and refuted the Trust's evidence with respect to all of the alleged bases of default. The only purported default on an obligation having anything to do with the Trust was Tinkham's assertion that the debtor's removal of sand from a lot constituted waste.  Frankly put, the court considered this alleged basis of default to be petty and non-substantive.  There was ample evidence from which the court could conclude that the bases of default were asserted in bad faith.

10

## DISCUSSION

Under 11 U.S.C. § 502(a), "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  If an objection to the claim is made, the court will determine the amount of the claim after notice and a hearing. § 502(b).  A properly filed and executed proof of claim constitutes prima facie evidence of the validity and amount of the claim.  Fed. R. Bankr. P. 3001(f); *Stancill v. Harford Sands, Inc. (In re Harford Sands, Inc.)*, 372 F.3d 637, 640 (4th Cir. 2004); *see also, e.g.*, *In re Deep River Warehouse, Inc.*, 2005 WL 1513123, at *2 (Bankr. M.D.N.C. June 22, 2005).  The debtor, in objecting, bears the burden of presenting evidence sufficient to rebut the presumed validity and amount of the claim, although the debtor need not disprove the claim.  *Harford Sands*, 372 F.3d at 640.  If a debtor meets that standard and rebuts the prima facie validity of the claim, the Bankruptcy Code's burden-shifting framework transfers to the creditor the ultimate burden of proving the validity and amount of the claim by a preponderance of evidence.  As the Fourth Circuit explained in *Harford Sands*,

> [i]f the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence. ... The creditor's burden is heightened when it is an "insider" ... as, among other things, the relative of a director, officer, or person in control of the debtor corporation. 11 U.S.C. § 101(31)(B)(vi).  An insider's dealings with a bankrupt corporation are ordinarily subject to "rigorous" or "strict" scrutiny. ... In such a situation, the "burden is on an insider claimant to show the inherent fairness and good faith of the challenged transaction."

*Id*. at 640-41 (multiple citations omitted).

In this case, applying the § 502 framework, the Trust's claim for $902,716.79 inclusive of interest was presumptively valid when filed.  The debtor, objecting, proffered ample evidence tending to rebut the validity and amount of the claim.  Specifically, the debtor put forth evidence

11

tending to show that Tinkham, on behalf of the Trust, either manipulated or made calculation errors with respect to the interest component of the claim; that certain aspects of the interest component constituted a penalty; that the Trust's claim should have but did not reflect an absolute assignment; and that the Trust's claim includes other calculation errors. Accordingly, the burden shifted to the Trust to establish, by a preponderance of the evidence, both the validity and amount of its claim.[10]  In assessing that evidence, as the Fourth Circuit noted in *Harford Sands*, "the allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of its equitable powers."  *Harford Sands*, 372 F.3d at 640, *quoting Canal Corp. v. Finnman*, 960 F.2d 396, 404 (4th Cir. 1992).

The Trust's position, as summarized during closing arguments, is that the debtor's objection boils down primarily to a matter of simple math, does not require interpretation or analysis of loan documents, and turns purely on whether the claim reflects calculation errors, which, the Trust contends, it does not.  To the extent the court does examine the loan documents, the Trust argues that the debtor did not satisfy the preconditions necessary to qualify for an interest rate reduction of 18% to 15% as provided for in the 2013 Amendment, that compound interest was properly calculated using standard methodologies, that the assignment was both collateral in nature and properly accounted for in all respects, and that the 5% late fees were authorized by and imposed in accordance with the 2011 Note and 2013 Amendment.  The Trust

---

[10]The court takes note that the more "rigorous" degree of scrutiny provided for in *Harford Sands* could be applied here due to Tinkham's insider status with respect to the debtor. Tinkham has extensive professional and familial ties to OBX in his capacity as one-time legal advisor to the debtor, an equity investor, and brother-in-law to Willis.  Because the Trust was not able to satisfy the lower "preponderance of the evidence" standard, however, there was no need for the court to assess whether the Trust could, in satisfaction of the higher standard, show the "inherent fairness and good faith" of the transactions giving rise to its claim.

12

also argues that principles of res judicata preclude the court's consideration of some of these
issues.

The debtor contends that the calculations put forward by the Trust are "simply wrong"
and include errors and improper allocations dating back to 2009.  Emphasizing that Tinkham was
solely responsible for *all* material input into the calculation process, the debtor maintains that the
Trust's claim reflects Tinkham's self-serving interpretations of the underlying documents.
Specifically, the debtor challenged the existence and assertion of the events of default; selection
and adjustment of the applicable interest rate; the methodology used to calculate compound
interest; the inclusion of unfounded late fees; and the failure to account for what the debtor
contends is an absolute assignment of the promissory note dated December 20, 2013.  The court
will address these components of the objection in turn, beginning with the assignment issue.[11]

## I.       The December 20, 2013 Assignment

The uncontested evidence established that on December 20, 2013, Florida OBX, LLC
executed a promissory note wherein it promised to pay, to the debtor, the sum of $900,000.
Debtor's Ex. 1 ("2013 Promissory Note").  Within the 2013 Promissory Note is a recitation of
the fact of its assignment to Tinkham, as trustee for the Trust.  The 2013 Assignment, also dated

---

[11] The documents related to the Trust's claim contain choice of law provisions that
sometimes specify the law of North Carolina, and at other times the law of the Commonwealth
of Virginia.  The December 20, 2013 Promissory Note, for example, specifies application of
North Carolina law; the 2013 Amendment, executed on the same day, provides that Virginia law
applies.  The 2011 Note also is be construed under Virginia law.  Counsel for both sides
indicated during the hearing that they view the choice of law issue to be of relatively little import
given the general similarity in how the issues would be viewed under the statutory and case law
of either state.

13

December 20, 2013, is, on its face, an unqualified and absolute assignment.  Again, that language

provides:

> For value received, the Assignor does hereby grant, sell, assign, transfer and
> convey unto the Assignee, its successors and assigns, all of the Assignor's right,
> title and interest, both legal and equitable, in, to, and under, (i) the Note, together
> with all amounts due and to become due thereon, including interest; (ii) the Deed
> of Trust, together with the real property described therein and all rights accrued or
> to accrue thereunder, including interest, and (iii) all other security for repayment
> of the Note, if any, including, but not limited to, the following: the Loan
> Agreement between Florida OBX, LLC, Borrower, and Outer Banks Ventures,
> Inc., Lender, dated December 20, 2013.
>
> This Assignment is made with recourse.
>
> Assignor further authorizes and empowers Assignee, its successors and assigns, to
> exercise all rights, powers and privileges conferred upon Assignor by the Note,
> the Deed of Trust, and any other instrument which secures repayment of the Note,
> including, but not limited to, the right to invoke the foreclosure and sale authority
> given in the Deed of Trust to the beneficiary, in as full and ample a manner as
> Assignor is authorized and empowered to exercise same.

Debtor's Ex. 2 at 1-2.  The assignment of the 2013 Promissory Note is not accounted for in the

Trust's calculation of its claim on the date of the assignment.  The debtor having sufficiently

rebutted the presumed validity and amount of the Trust's claim, the evidentiary burden to show

that the assignment was merely collateral shifted to the Trust.

    In support of the Trust's claim, Tinkham testified that the 2013 Assignment was a

collateral assignment intended to commemorate "pass-through payments," not an absolute

assignment.  Tinkham, an attorney, drafted both the 2013 Amendment and the 2013 Promissory

Note.  According to Tinkham, the 2013 Assignment was recorded by the Trust merely to notify

third parties, and had no effect upon the parties to it.  Tinkham also emphasized that the 2013

*Amendment* – not the 2013 Assignment, or the 2013 Promissory Note – includes language

providing for OBX "collaterally assigning the Phase 12 Note" and, based on that language, urged

14

the court to construe the 2013 Assignment in a way that is "internally consistent" as between those documents. *See* Trust's Ex. Q-10 at 2. According to the Trust, these documents, all of which were executed on the same day, come within the "one transaction" exception to the parol evidence rule, such that the court can and should look to the 2013 Amendment's reference to a "collateral" assignment in determining the nature of assignment. *See, e.g., Shevel's, Inc.-Chesterfield v. Southeastern Assocs., Inc.*, 320 S.E.2d 339, 343 (Va. 1984) (noting that the "collateral contract doctrine" is an exception to the parol evidence rule); *High Knob, Inc., v. Allen*, 138 S.E.2d 49, 52 (Va. 1964) (holding that "the parol evidence rule does not exclude parol proof of a prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing"); *see also, e.g., Borden, Inc. v. Brower*, 199 S.E.2d 414, 419-20 (N.C. 1973) (discussing all exceptions to the parol evidence rule). Finally, Tinkham testified that even if the assignment was absolute, an immediate credit of $900,000 at the time the assignment was made wouldn't be necessary, because the value of the asset being assigned had not been "pinned down" as $900,000.

The debtor maintained that the Trust's efforts to introduce evidence to contradict the written terms of the 2013 Promissory Note and the 2013 Assignment *were* barred by the parol evidence rule, and that none of the possible exceptions to that doctrine apply. The debtor argues that the assignment is absolute, and Willis testified that execution of the assignment had "a major negative effect" on the debtor because it took a significant asset off the debtor's balance sheet while leaving OBX with the same indebtedness.

15

Having considered all the foregoing, the court concludes that the 2013 Assignment is, by its terms, an absolute assignment. It effectuates a full and immediate conveyance to the Trust of the debtor's interests in the 2013 Promissory Note, including but not limited to a right to invoke the foreclosure and sale authority given in the Deed of Trust. *See also, e.g.*, *In re Raleigh/Spring Forest Apts. Assocs.*, 118 B.R. 42, 44 (Bankr. E.D.N.C. 1990) (noting distinction between absolute and conditional assignment in context of rents). Indeed, there is no plausible factual or legal basis upon which the court could reach any other conclusion.

The Trust's "one transaction" argument is unavailing. Even assuming the court agrees with the Trust that the three documents may be construed together, the "collateral" reference in the 2013 Amendment (which Tinkham drafted) is prospective in nature, referring to what "will" or may happen; in contrast, the 2013 Promissory Note – *i.e.*, the actual asset being assigned, which Tinkham also drafted – specifies that Florida OBX "*has assigned this Note* to J. Jeffrey Tinkham, Trustee of the J. Jeffrey Tinkham Family Trust ("Trust") *pursuant to an Assignment of Note and Deed of Trust with Recourse instrument dated on or about the date of this Note*." The 2013 Assignment to which the 2013 Promissory Note refers is, on its face, an absolute assignment. Ultimately, while the 2013 Agreement conceivably could be read to suggest that the parties contemplated a collateral assignment, that aspect of the 2013 Agreement is inconsistent with the actual terms of both the 2013 Promissory Note and the 2013 Assignment. *See High Knob*, 138 S.E.2d at 52. Those instruments include no such reference and neither can be read in the manner urged by the Trust. Thus, any effort by the court to collectively construe these documents using the "one transaction" exception to the parol evidence rule leads the court back to the same conclusion: The assignment was absolute.

16

The Trust argued further that even if the assignment was absolute, it still would not require an immediate credit against OBX's debt because the true value of the asset being assigned was not "pinned down" at $900,000. However, the Trust offered no authority for this position. The court agrees with the debtor that there is no way here to have an absolute assignment that does *not* result in an immediate credit of $900,000. If the note can be taken off a balance sheet, it can be put on one. Here, effective immediately upon assignment, the 2013 Promissory Note was Tinkham's to do with as he chose. The 2013 Assignment should have been accounted for by the Trust at its face value of $900,000 at the time that absolute assignment took place.

It is worth noting here that Tinkham drafted most of the documents at issue in this case and sought, as was his prerogative, to ensure that their terms inured to his own benefit and that of the Trust. During the hearings, Tinkham consistently provided specific, detailed, and confident testimony with regard to the provisions in these documents in instances where it was helpful to him to do so, including in contexts where the documents could potentially be interpreted in different ways (as with the calculation of compound interest, discussed below). However, when the documents' language became problematic to his position, and in the context of what disclosures had been made to OBX and when, the details became markedly fuzzy.[12] This impaired Tinkham's credibility as a witness. It also informed the court's analysis of the extent to

---

[12]For example, Tinkham imposed the 5% late fee and default interest under the 2011 Note as of January 1, 2012, yet continued to make advances to OBX through June of 2012. Asked whether he had ever specifically given notice to OBX that it was in default notwithstanding both parties' continued performance, and, if so, when, Tinkham testified that the Borrower's Certificate dated September 12, 2012 provides those details. Trust Ex. Q-5. Asked if he had informed OBX of the default *prior* to September 12, 2012, Tinkham testified that he "could not recall."

which certain vagaries in the loan documents could plausibly be considered innocuous or, instead, as opportunities for sharp dealing.

In conclusion, the evidence established that the 2013 Assignment was absolute in nature. The Trust did not properly account for assignment of the 2013 Promissory Note in calculation of OBX's debt and the interest owed on that debt, and its proof of claim likewise fails to account for the assignment.

## II.    Interest Component and General Calculation Errors

As an initial matter, and contrary to the Trust's suggestion, it is clear that questions of accuracy as to computation of the Trust's proof of claim are unrelated to and unaffected by the court's earlier order enforcing the waiver language in the 2013 Amendment.  (D.E. 28)  That order in no way prohibits the debtor from asserting defenses to any effort by the Trust to recover what is *not* owed.  Principles of res judicata would apply to matters that were or should have been litigated in the AP.  *See Whiteacre P'ship v. Biosignia, Inc.*, 591 S.E.2d 870, 880 (N.C. 2004) (res judicata doctrine furthers interests of judicial economy by precluding relitigation of matters that were or should have been adjudicated in a prior action); *Williams v. Peabody*, 719 S.E.2d 88, 92 (N.C. App. 2011) (discussing elements that must be shown by party asserting res judicata).  These matters were *not*, and indeed, the court said as much in the Order Dismissing: "The court notes that the fourth cause of action, ... fifth cause of action for disallowance of claims and liens against property of the estate, and [the sixth cause of action] *are actually remedies and do not provide independent bases for relief.  Accordingly*, and given the court's dismissal of the substantive claims ..., these causes of action are dismissed as well."  Order Dismissing at 14 fn. 16 (emphasis added).  The matters presently before the court were not

18

covered in the AP because they go to the heart of the amount of the claim against the debtor, not to claims against the Trust.

As noted earlier, Tinkham testified at length as to his confidence in the accuracy of his own calculations and those that Mr. Brotman undertook at his direction, and took the position that any calculations referenced within the various agreements between the debtor and the Trust are no longer subject to change.  If there are mistakes within those calculations, the Trust reasons, then, those mistakes would be unilateral in nature, which precludes any correction of them at this late date.  In contrast, the debtor's position is that any errors in calculation resulting in the debtor's apparent assumption of any obligation to pay an amount in excess of what it originally agreed to pay (such as the recitation of the amount due in, for example, the 2013 Amendment) are the product of mutual mistakes, and are readily subject to correction.

This conflict was fully resolved by the testimony.  During the hearings, Tinkham testified that on his own behalf, and on behalf of the Trust, he sought to recover from OBX and the individual signatories only what legitimately was owed and, further, that he intended for Trust Exhibits A and B to be accurately calculated in ways consistent with the terms of the loan documents. Asked during cross-examination whether he intended to collect any sums in excess of what was due under the loan documents, Tinkham stated that he did not.  On behalf of the debtor, Willis testified that he, debtor OBX, and other signatories agreed and intended to pay only the amounts that they actually owed.

Accordingly, both parties having testified to their express intentions to either pay or be paid the correct amounts owing pursuant to the loan documents, the court will proceed on the premise that any errors in calculation by Tinkham for the Trust, and any apparent acceptance of

19

those erroneous calculations by OBX based on Tinkham's representations of accuracy, are the product of the parties' mutual mistake.[13]  *See Stephens v. Dominion Bank of Richmond*, 1988 WL 619089, 1988 Va. Cir. LEXIS 430 (Cir. Ct. Va. 1988), *citing Gibbs v. Price*, 150 S.E.2d 551 (Va. 1966); *see also, e.g., Wells Fargo Bank, N.A. v. Coleman*, 768 S.E.2d 604, 611 (N.C. App. 2015) (discussing bases upon which a legal instrument may be reformed on grounds of mutual mistake).  In *Stephens*, the parties executed a new note on one that previously had been outstanding, and both parties intended that the principal amount would be the existing loan balance.  Due to a calculation error by the lender bank, the balance set out in the new note was too low.  When that error came to light, the borrowers sought to avoid repayment of the full amount of their indebtedness, contending that the bank was "now stuck with the consequences of that negligence."  *Stephens*, 1988 WL 619089 *2.  As the Virginia state court explained, "[t]he element of mutuality is not negated by the fact that the mistake resulted from an error of one of the parties. By definition, a mistake is always someone's fault.  A mistake is, in essence, a fault."  Further, that "mutuality exists in the fact that the mistake was not unilateral – , i.e., was not harbored by only one of the parties.  *Rather it created a misexpression of the true intent of both parties*."  *Id.* at *2-3 (emphasis added).  The court held that in these instances, "equity will reform the instrument to give true effect to the intent of the parties, despite a contrary expression which the parties mistakenly believed to memorialize their bargain.  *Id.* at *3; *see also Shevel's, Inc.*, 320 S.E.2d at 343 (noting that court may reform instrument and apply exceptions to parol evidence rule where written contract terms are based upon mutual mistake).

---

[13]The alternative to this approach would be for the court to conclude that Tinkham exercised bad faith in trying to manipulate the contracts, and/or sought to defraud the debtor by intentionally trying to collect more than he reasonably believed to be due.

Mr. Brotman, the CPA retained by Tinkham and the Trust to calculate the proof of claim, testified that all the information that he used, including amounts and dates, was provided to him by Tinkham.  He put this data into "TValue," an amortization software program, which then handled all the actual calculations.  Mr. Brotman testified that in his preparation of the calculations, he had no input into selection or interpretation of the data used, did not verify any of the numbers given to him by Tinkham, did not see and has no independent knowledge of any loan documents, and did not use or rely upon them.  In sum, Mr. Brotman took the numbers provided by Tinkham, plugged them into the software program, and printed out the results.  The court does not mean to disparage Mr. Brotman's expertise as a CPA, but rather notes that in this instance, his expertise was irrelevant because it was not used.[14]  The proof of claim calculations are based entirely on Tinkham's personal interpretation of documents that, in most instances, he personally drafted.

Finally, the court will address the debtor's remaining grounds for objection – and the areas in which it was incumbent on the Trust to prove its claim by a preponderance of the evidence – in the context of two loosely grouped categories: Late fees and default interest, and compound interest.

### A.    Late Fee Charges and Default Interest

The court turns first to the purely legal questions of the parameters applicable to a creditor's assessment of late charges and default interest, as well as the question of whether, under state law, a creditor may assess *both* a late fee *and* default interest for the same event of

---

[14]The court ultimately determines that Mr. Brotman's methodology in calculating compound interest was entirely appropriate; the problem with the Trust's calculations arises solely from the input numbers supplied by Tinkham.

default.  Here, the Trust offered no authority in support of its effort to recover both late fees and default interest, and the court is unaware of any.[15]

### 1.    Late Fee Charges

Under Virginia law, it is clear that a creditor may not recover late fee charges if the charges are imposed as a penalty, but can recover charges imposed as a means to protect the creditor when actual damages as contemplated at the time the contract was made are uncertain or difficult to measure, and when the projected charges are not "out of all proportion to the probable loss."[16]  *Perez v. Capital One Bank*, 522 S.E.2d 874, 875 (Va. 1999).  "On the other hand, when the damages caused by the breach are prone to definite measurement or when the stipulated amount would grossly exceed actual damages, courts of law usually construe such a provision as an unenforceable penalty."  *Id.* at 875-76 (citing cases); *Doral Bank PR v. Federal Home Loan Mortgage Corp.*, 2012 WL 1184340, 477 Fed. Appx. 31 (4th Cir. 2012) (discussing bases upon which courts will refuse to enforce liquidated damages provisions, including late fees, on grounds that the damages sought are penalties); *WRH Mortg., Inc. v. S.A.S. Assocs.*, 214 F.3d 528, 534 (4th Cir. 2000) (holding that "contract provisions calling for breach of contract

_____

[15]There is, however, ample authority to the contrary.  *See, e.g., Brandywine Townhouses, Inc. v. Fannie Mae (In re Brandywine Townhouses, Inc.)*, 518 B.R. 671, 680 (Bankr. N.D. Ga. 2014) (holding that the "assessment of both late charges and default interest would result in a double recovery" for a creditor because the creditor was "already being compensated for increased administrative costs through default interest"); *In re Dixon*, 228 B.R. 671, 680 (Bankr. N.D. Ga. 2014) (noting that "even where the late charge is reasonable, however, a creditor may be denied recovery on that basis where it also asserts a claim to a default rate of interest").  These cases, while persuasive, construe whether a creditor can recover both late fees and default interest using the "reasonableness" standard in 11 U.S.C. § 506(b), which may implicate the bankruptcy court's exercise of its equitable powers.  Application of those equitable principles is not a component of the court's present inquiry under § 502.  *See In re Parker*, 2015 WL 5553767, 2015 U.S. Dist. LEXIS 124348 (E.D.N.C. 2015).

[16]Both the 2011 Note and the 2013 Amendment specify that Virginia law applies.

22

damages grossly in excess of actual damages generally are unenforceable as penalties or forfeitures").

Virginia statutory law provides that the term "'*[l]ate charges*' does not include charges imposed upon acceleration of the entire debt or costs of collection and attorney fees as otherwise permitted by law by reason of a default by the debtor." Va. Code Ann. § 6.2-400.A. And,

> Any lender or seller may impose a late charge for failure to make a timely payment of any installment due on a debt, whether installment or single maturity, provided that such late charge does not exceed five percent of the amount of such installment payment and that the charge is specified in the contract between the lender or seller and the debtor.

§ 6.2-400.B. The "amount of money payable upon default may constitute valid liquidated damages or an unenforceable penalty in Virginia." *FNB Southeast v. Dean*, 2009 WL 10291356, 83 Va. Cir. 503, 503 (Cir. Ct. Va. 2009). Moreover, as was recently recited by the district court for the Eastern District of Virginia:

> As the Supreme Court of Virginia has explained, parties to a contract may agree in advance about the remedy resulting from a breach, including damages, but only when (i) the actual damages contemplated at the time of the agreement are uncertain and difficult to determine with exactness and (ii) the amount fixed is not disproportionate to the probable loss. *See O'Brien v. Langley School*, 256 Va. 547, 551, 507 S.E.2d 363 (1998). If these conditions are not met, then the provision "will be construed as an unenforceable penalty." *Id.* Here, there is little or no basis to suggest that the actual damages contemplated a the time of the agreement were uncertain; rather, it is clear that the damages at the time of a breach are the amount due and payable under the contract. *See Taylor v. Sanders*, 233 Va. 73, 75, 353 S.E.2d 745 (1987) ("failure to pay a sum of money" is "susceptible of definite measurement").

*Job v. Simply Wireless, Inc.*, 160 F. Supp. 3d 891, 897 (E.D. Va. 2015), *appeal denied*, 2016 WL 8229037 (E.D. Va. 2016).

In the instant case, the Trust's proof of claim includes a five percent late fee of $39,748.88 imposed as of January 1, 2012, which was added to the principal amount owing

23

under the 2011 Note, as well as a second late fee charge of $70,066.35, imposed on May 29,

2014.  Trust Exs. A and B.  According to Tinkham, the 2013 Amendment "reset the clock," and

there were events of default under the terms of the 2011 Note and the Future Advances DOT,

*subsequent* to entry of the 2013 Amendment, that permitted imposition of this second late fee.

Tinkham testified further that there were defaults of a kind that permitted acceleration of the

2011 Note, such that the late fee was due on the accelerated amount.

Both Willis and Tinkham testified that the Trust incurred no additional costs due to

defaults or nonpayments; instead, Willis's testimony and the Trust's exhibits made clear that any

costs incurred in connection with the loans were separately charged to the debtor *in addition* to

the late fees and default interest.  The court concludes that the Trust may not recover either of

these late fees from the debtor because their imposition is not supported by the loan documents

and, further, they constitute penalties under Virginia state law.

The first late fee was imposed under the 2011 Note.  Under the express terms of that note,

which was dated June 1, 2011, the principal, accrued interest and other authorized fees were

payable on or before December 31, 2011. The 2011 Note provides:

> Upon the undersigned Maker's default under this Note, the undersigned Maker
> also agrees to pay (i) a late charge equal to five percent (5%) of any sum which is
> not paid when due, (ii) all costs of collection, including actual attorneys' fees,
> costs, and other reasonable and necessary expenses and (iii) to pay interest on the
> delinquent sum at the default interest rate of eighteen percent (18%) per annum or
> the highest rate permitted by law, whichever rate is less.

*Id*.  That language could only permit imposition of a late fee of 5% of the amount "not paid when

due," yet the evidence showed that Tinkham and the Trust continued to lend additional sums to

the debtor, with no notice of default, after January 1, 2012.  That is the date upon which

Tinkham – on October 31, 2013 – retroactively assessed the first 5% late fee.  Trust Exs. B, I.

24

The debtor contends that imposition of the fee was improper because the parties, by their conduct, clearly extended the maturity date, and there was no basis in the 2011 Note upon which the Trust could assert that an event of default occurred while still continuing to advance money to the debtor.

The second late fee was assessed by Tinkham to apply retroactively as of May 29, 2014, notwithstanding the fact that the amounts due and payable under the 2011 Note had been extended, in the 2013 Amendment, to December 31, 2015. The 2013 Amendment provides that "upon the occurrence and during the existence of any event of default or breach under this Amendment or the Loan Documents, the Holder shall have the right to immediately exercise any or all of its right and remedies under this Amendment and the Loan Documents." Trust Ex. Q-10 ¶ 17. The "Loan Documents" are the 2011 Note and the Future Advances DOT. Trust Exs. Q-2, Q-4. The various bases of default alleged by Tinkham are discussed below, but what they obviously did *not* include was any allegation of the debtor's failure to pay the amount due on or before December 31, 2015. Instead, on December 5, 2014, Tinkham, for reasons that he conceded were unrelated to OBX's performance of its payment obligations to the Trust, declared OBX and the other makers in default. This default letter was issued more than a year prior to the date on which payment was due, and Tinkham retroactively assessed the late fee as of May 29, 2014.[17] Having carefully considered the evidence and Tinkham's testimony with respect to the bases upon which he determined OBX to be in default, the court concludes that the Trust wholly

---

[17] Tinkham testified that he determined OBX to be in default as of May 29, 2014 based on a judgment in the amount of $1,500,000.00 obtained by Bank of Hampton Roads against Willis, Richard Brindly, and Patricia Brindley and recorded on June 3, 2014; this, according to Tinkham, rendered one or any of those makers insolvent and therefore could constitute a default under the 2013 Amendment, insofar as that document incorporated the 2011 Note.

failed to meet its burden of establishing, by a preponderance of the evidence, that it was entitled

to assess the late fee pursuant to the 2013 Amendment, 2011 Note, and/or the Future Advances

DOT.[18]  While charges of this nature may in appropriate instances be assessed as provided for by

Va. Code Ann. § 6.2-400.A and -400.B, here, the Trust 1) sought to retroactively impose the fee

at times disassociated from any "late payment," 2) calculated the fee based on the entire

outstanding balance; 3) sought to recover the fee in addition to the Trust's actual, readily

ascertainable costs associated with any late payment; and 4) contemporaneously sought to collect

interest at the default rate of 18%, on the entire balance due.

### 2.    Default Interest

The Trust's proof of claim includes default interest under the 2011 Note at the rate of

18% per annum, compounding monthly, as of January 1, 2012.  The 2011 Note took as its

starting point the 2009 Agreement, which bore "interest at the rate of six percent (6%) per

annum compounding monthly ... on the principal sum of $483,028.00" beginning on January 1,

2010.  Trust Exs. Q-2, Q-3.  The 2011 Note also provided that as of June 1, 2011, the

outstanding balance due under the 2009 Agreement (inclusive of two $50,000 payments made by

the Trust) was $583,028.00, as to which interest at the rate of seven and one-half percent (7.5%)

per annum would "accrue and compound monthly on all outstanding sums owed or advanced

under this Note from and after January 1, 2011 until this Note's maturity date of December 31,

---

[18]The 2013 Amendment does not reference a 5% late fee, so the only possible authority
for Tinkham's imposition of that fee could be within the 2011 Note.  Most of the events of
default cited in Tinkham's December 5, 2014 letter are based on provisions within the Future
Advances DOT, which specifies certain requirements as to notice and the opportunity to cure in
the event of default.  The Trust's evidence did not establish the Trust's acknowledgment of those
terms, much less its compliance.

2011." Trust Ex. Q-3.  The 2011 Note identifies the 18% rate as a default rate; as noted earlier, and as Tinkham conceded during the hearing, it does not stipulate that interest at the default rate is to be compounded monthly.

The Trust's Exhibit I shows that on or around October 21, 2013, Tinkham informed Willis that he had directed Mr. Brotman to include the 5% late fee *and* to apply an 18% interest rate to the amount outstanding under the 2011 Note.  Tinkham testified during the hearing that he intended to collect both. As the court already has discussed, the Trust may not recover both a late fee and default interest under Virginia law.  Here, with respect to this first alleged default, if the Trust had sought *only* default interest, it is at least conceivable that the Trust might have been within its contractual bounds to impose it, and the differential between the pre-default rate of 7.5% and default rate of 18% is not wildly out of bounds.[19]   That, however, is not the standard applicable to the present inquiry.  Instead, it was incumbent on the Trust to establish by a preponderance of the evidence that it properly exercised its ability to declare default and to recover default interest on that basis.  Not only did it fail to satisfy that standard, the Trust offered no authority for the proposition that a creditor can seek to improperly impose both a late fee and default interest, lose on one ground, and still recover the other as a "Plan B."

---

[19]Though conceivable, it is not likely.  In *FNB Southeast*, discussed earlier, the defendant-borrower argued that the "increase in the interest rates from 16.386% to 18% and from 10.139% to 18% as well as attorney's fees and costs in the case of default" were "not valid liquidated damages because actual damages were reasonably ascertainable at the time of contracting and because the increased interest rates were grossly in excess of damages actually suffered" upon default.  *FNB Southeast*, 82 Va. Cir. at 503-04.  The court agreed, concluding that under those circumstances the increased interest rates did constitute a penalty, because the notes were for amounts certain at specific interest rates for specific periods of time.  *Id.* at 504.

Turning to the Trust's declaration of default under the 2013 Amendment, here, the Trust's entitlement to default interest obviously is dependent upon a showing that the debtor defaulted. As the court already has discussed, the evidence did not support the Trust's contention that OBX was in default at the time Tinkham sent the December 5, 2014 default letter. Moreover, even if OBX had been in default, the Trust still would be precluded under Virginia law from claiming a windfall double-recovery, especially for damages that would have been readily ascertainable. The evidence established that the eighteen percent interest rate perpetuated by the 2013 Amendment is the same default rate[20] first imposed under the 2011 Note, which the Trust sought to recover in tandem with a (retroactively imposed) late fee. This component of the Trust's claim is disallowed.

### B.    Calculation of Compound Interest

As discussed earlier in this order, both the 2011 Note and the 2013 Amendment provide for compound interest. Notwithstanding the debtor's objections, it appears to the court that the Trust's underlying methodology is appropriate. The calculation errors embodied in the proof of claim are based upon erroneous data input rather than methodology. The Trust is entitled to interest at the contractual annual pre-default rate of six percent (6%) per annum compounding monthly commencing on January 1, 2010 through December 31, 2010, and at seven and one-half

---

[20]The 2011 Note provided for "default" interest at the rate of eighteen percent (18%) "per annum" and did not provide for default interest to be compounded monthly. The 2013 Amendment perpetuates the eighteen percent interest without referring to it as default rate and, in connection with that, further provides that "the parties acknowledge that the interest rate that *accrues and compounds monthly* on all outstanding sums owed under the Loan Documents is eighteen percent (18%) per annum." Thus, the terms the 2013 Amendment seeks to have the parties "acknowledge," in particular "[*s]aid eighteen percent compounding rate*," are to that extent demonstrably inaccurate. Trust Ex. Q-10 ¶ 7 (emphasis added).

percent (7.5%) per annum, compounded monthly, commencing on January 1, 2011, through the petition date.

## CONCLUSION

The debtor's objection to claim therefore is **ALLOWED**.  The Trust is directed to file, within fourteen days, an amended proof of claim that appropriately credits the assignment on the date it was made, excises both late fees, and recalculates interest in accordance with this order.

**END OF DOCUMENT**